W. Daniel "Dee" Miles, III (*pro hac vice*)
Alison D. Hawthorne (*pro hac vice*)
Paul W. Evans (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
Dee.Miles@BeasleyAllen.com
Alison.Hawthorne@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com
218 Commerce Street
Montgomery, AL 36104
Telephone: 334.269.2343
Facsimile: 334.954.7555

Paul Byrd (*pro hac vice*)
**PAUL BYRD LAW FIRM, PLLC**
Paul@paulbyrdlawfirm.com
415 N. McKinley St., Suite 210
Little Rock, AR 72205
Telephone: 501.420.3050
Facsimile: 501.420.3128

Aaron Cash (*pro hac vice*)
**HERRERA LAW GROUP**
Cash@herreralawnwa.com
1821 S. 8th Street
Rogers, AR 72756
Telephone: 479.770.5292
Facsimile: 479.770.6042

Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Taylor Applegate (SBN 357742)
taylora@salahilaw.com
Nicole Cabañez (SBN 365099)
nicolec@salahilaw.com
**SALAHI PC**
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Telephone: 415.236.2305

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| JANE DOE I, JANE DOE II, JOHN DOE I, JANE DOE III, JANE DOE IV, and JANE DOE V<br><br>Plaintiffs,<br><br>v.<br><br>X.AI CORP., X.AI LLC, and X.AI HOLDINGS LLC. | Case No. 26-cv-8567<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Defendants.

## TABLE OF CONTENTS


Page

I. NATURE OF THE ACTION ... 1
II. JURISDICTION AND VENUE ... 2
  a. Divisional Assignment ... 3
III. PARTIES ... 3
IV. FACTUAL ALLEGATIONS ... 4
  a. Generative Artificial Intelligence (“AI”) ... 4
V. Availability and Use of Industry-Standard Guardrails to Prevent CSAM ... 5
  a. Proprietary Models ... 5
  b. Open-Weight Models ... 8
VI. xAI’s Proprietary Generative AI Model Grok ... 9
  a. xAI introduced Grok to the market. ... 9
  b. xAI designed and marketed Grok’s ability to make “spicy” content. ... 11
  c. xAI has and continues to profit from Grok’s ability to make sexualized content. ... 16
  d. xAI has failed to report the CSAM it generates. ... 19
  e. Elon Musk’s financial investment in and control of xAI. ... 21
VII. AI Large Language Model Licensing ... 21
VIII. AI-Generated Child Sexual Abuse Material is Illegal ... 22
IX. Plaintiffs Suffered Severe Harm from Defendants’ Production of their AI-Generated CSAM ... 23
  a. The Bloodworth Investigation in Bentonville, Arkansas ... 23
  b. Plaintiff Jane Doe I ... 24
  c. Plaintiff Jane Doe II and John Doe I ... 25
  d. Plaintiffs Jane Doe III and Jane Doe IV ... 25
  e. Plaintiff Jane Doe V ... 26
X. Ongoing Harm From the Dissemination of Plaintiffs’ CSAM Files ... 27
XI. CLASS ALLEGATIONS ... 27
XII. CAUSES OF ACTION ... 30
COUNT 1 Masha’s Law: Production of Child Pornography 18 U.S.C. §§ 2255(a), 2251(a) (on behalf of all Plaintiffs and all Classes against all Defendants) ... 30
COUNT 2 Masha’s Law: Production with the Intent to Distribute Child Pornography 18 U.S.C. §§ 2255(a), 2252A(a)(7) (on behalf of all Plaintiffs and all Classes against all Defendants) 31
COUNT 3 Masha’s Law: Distribution of Child Pornography 18 U.S.C. §§ 2255(a), 2252A(a)(2) (on behalf of all Plaintiffs and all Classes against all Defendants) ... 33
COUNT 4 Masha’s Law: Possession of Child Pornography 18 U.S.C. §§ 2255(a), 2252A(a)(5)(B) (on behalf of all Plaintiffs and all Classes against all Defendants) ... 34
COUNT 5 Obscene Visual Representations of the Sexual Abuse of Children 18 U.S.C. § 2252A(f)(1) (on behalf of all Plaintiffs and all Classes against all Defendants) ... 35

## TABLE OF CONTENTS
**(continued)**

**Page**

COUNT 6 Trafficking Victims Protection Act, Beneficiary Liability 18 U.S.C. §§ 1595, 1594, 1591(a)(2) (on behalf of all Plaintiffs and all Classes against all Defendants) .................... 37
COUNT 7 Civil Action for Unlawful Creation of Deepfake Visual Material Ark. Code Ann. §§ 5-14-139, 16-118-121 (on behalf of all Plaintiffs and the Arkansas xAI Subclass against all Defendants) .................... 38
COUNT 8 Negligence (on behalf of all Plaintiffs and the Arkansas xAI Subclass against the xAI Defendants) .................... 39
COUNT 9 Negligence – Design Defect (on behalf of all Plaintiffs and all Classes against all Defendants) .................... 40
COUNT 10 Negligent Undertaking (on behalf of all Plaintiffs and all Classes against all Defendants) .................... 42
COUNT 11 Negligent Infliction of Emotional Distress (on behalf of all Plaintiffs and all Classes against all Defendants) .................... 43
COUNT 12 Intentional Infliction of Emotional Distress (on behalf of all Plaintiffs and all Classes against all Defendants) .................... 44
PRAYER .................... 44
JURY DEMAND .................... 45

Plaintiffs Jane Doe I by and through her guardians, Jane Parent I and John Parent I, Jane Doe II and John Doe I by and through their guardians, Jane Parent II and John Parent II, Jane Doe III and Jane Doe IV, by and through their guardians, Jane Parent III and John Parent III, and Jane Doe V, by and through Jane Parent IV (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes," as defined below), for their complaint against Defendants X.AI Corp. X.AI, LLC, X.AI Holdings LLC (together "xAI" or "xAI Defendants").

## I. NATURE OF THE ACTION

1. The powerful tools of artificial intelligence can produce astounding results. Imagine: the video of a real child transformed through an AI platform to depict an entirely imagined scene. The face of the child remains; her limbs move like that of the real child; her laugh even retains its same tenor. But through the powers of an artificial neural network trained on billions of files depicting other content—including sexual content—her body is made to engage in conduct not her own. Like a rag doll brought to life through the dark arts, she can be manipulated into any pose, however sick, however fetishized, however unlawful. To the viewer, the resulting video appears entirely real. For the child, her identifying features will now forever be attached to a video depicting her own child sexual abuse.

2. Most companies creating, marketing, and selling or distributing access to generative AI models recognized this danger and chose to enact industry-standard guardrails to prevent the use of their products by one extremely dangerous group: child sex predators. Defendants' competitors incorporated such safeguard systems to prevent use of their models for production of "child sexual abuse material" (CSAM).[1] Defendants, however, did not, with tragic consequences for Plaintiffs and the Classes.

3. Where others saw a risk that required mitigation, xAI—and its founder Elon Musk—saw an opportunity to profit off the sexual predation of real people, including children. Knowing the type of harmful, illegal content that could—and would—be produced, xAI released Grok, a proprietary[2] generative artificial

---

[1] Plaintiffs use the term CSAM to mean "child pornography" as defined by 18 U.S.C. § 2256(8). Plaintiffs opt to use the term CSAM rather than "child pornography" because "pornography" implies consensual acts between adults, whereas this material includes minors who cannot legally consent. Framing this abusive content as pornography also minimizes the severity of the act, implying that it is a form of adult entertainment rather than the sexual exploitation of a minor, which can further traumatize survivors. Thus, in recognition of the severity of the crimes depicted, Plaintiffs use the term CSAM throughout the complaint to mean "child pornography" as defined by 18 U.S.C. § 2256(8).

[2] Grok is a proprietary AI model, meaning its source code, training data, and internal architecture are kept confidential and the image- and video-generation features can be accessed only through xAI's own

intelligence model with image- and video-making features that would respond to prompts to create sexual content with a person's real image or video. They knew Grok could produce such results, including by using the images and videos of children, and publicly released it anyway. Not satisfied with the money this would generate, xAI also licensed and profited from the sale of their dangerous AI technology to third-party companies, often located abroad, who in turn sold subscriptions to customers who could, via their applications, use Grok to produce tailor-made child sexual abusive content. In this way, xAI could attempt to outsource the liability of their incredibly dangerous tool.

4. Plaintiffs are six of the victims of Defendants' knowing production, possession, and distribution of AI-generated CSAM depicting actual minors. Their lives have been shattered by the devastating loss of privacy, dignity, and personal safety that the production and dissemination of this CSAM have caused and will continue to cause. Defendants' financial gain through the increased use of their image- and video-making products came at Plaintiffs' expense and wellbeing. Plaintiffs will have to spend the rest of their lives knowing that CSAM images and videos depicting them may continue to be findable online and trafficked and traded online by child sex predators. And Plaintiffs will face the lifelong burden of wondering whether strangers, friends, classmates, coworkers, or future employers have seen the invasive and sexually explicit content generated from images of them as children.

5. Plaintiffs now bring this action against Defendants for civil remedies for personal injuries suffered as a result of Defendants' conduct. Plaintiffs assert claims in five categories: (i) civil claims under Masha's Law, 18 U.S.C. §2255(a), for the production, distribution, and possession of child pornography, in violation of 18 U.S.C. §§ 2251(a), 2252A(a)(2), 2252A(a)(5)(B), and 2252A(a)(7), and under 18 U.S.C. § 2252A(f)(1) for distribution of child pornography; (ii) beneficiary liability under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1591, 1594, and 1595; (iii) claims under Ark. Code Ann. § 16-118-121; and (v) common-law claims for negligence, negligent undertaking, and negligent and intentional infliction of emotional distress.

## II. <u>JURISDICTION AND VENUE</u>

6. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 because this action arises under 18 U.S.C. §§ 2251(a), 2255(a), 2252A, and 18 U.S.C. §§ 1595, 1591(a)(1), 1594.

---

platforms/apps, with some versions only available for a fee.

This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because (i) at least one member of the proposed Class is a citizen of a state different from the Defendants; (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (iii) there are at least 100 class members; and (iv) none of the exceptions under the subsection apply to this action.

7. Under 28 U.S.C. §§ 1367(a), the Court may exercise supplemental jurisdiction over the state claims.

8. The Court has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business in this District, and pursuant to the nationwide service of process provision found in 18 U.S.C. § 2255(c)(1).

9. All xAI Defendants are headquartered in this District and its production, possession, and distribution of AI-generated CSAM occurred, in substantial part, in this District. xAI also marketed, sold, and distributed its generative artificial intelligence models from this District to citizens of California. xAI also received the financial benefit of participating in the production, possession, and distribution of CSAM, and from participating in a sex trafficking venture in this District.

10. Venue is proper under 28 U.S.C. § 1391(b) because xAI resides in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including xAI's creation and distribution of AI-generated CSAM, and personal jurisdiction exists in this District.

**a. <u>Divisional Assignment</u>**

11. Pursuant to Civil Local Rule 3-2(c), an intradistrict assignment to the San Jose Division is appropriate because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in this Division.

## III. <u>PARTIES</u>

12. Plaintiff Jane Doe I is a minor female who resides in Arkansas, and brings this action by and through her guardians, Jane Parent I and John Parent I.

13. Plaintiff Jane Doe II is a minor female who resides in Arkansas, and brings this action by and through her guardians, Jane Parent II and John Parent II.

14. Plaintiff John Doe I is a minor male who resides in Arkansas, and brings this action by and through his guardians, Jane Parent II and John Parent II.

15. Plaintiff Jane Doe III is a minor female who resides in Arkansas, and brings this action by and through her guardians, Jane Parent III and John Parent III.

16. Plaintiff Jane Doe IV is a minor female who resides in Arkansas, and brings this action by and through her guardians, Jane Parent III and John Parent III.

17. Plaintiff Jane Doe V is a minor female who resides in Arkansas, and brings this action by and through her guardians, Jane Parent IV.

18. X.AI LLC is a Nevada limited liability company and wholly owned subsidiary of X.AI Corp.

19. X.AI Corp. is a Nevada corporation and wholly owned subsidiary of X.AI Holdings LLC.

20. X.AI Holdings LLC is a Nevada corporation, and, as of February 2, 2026, a wholly owned subsidiary of SpaceX Corp., with a principal address of 1450 Page Mill Rd, Palo Alto, CA 94304. It also maintains offices in San Francisco, CA.

21. xAI owns the generative AI model known as Grok and the image- and video-generator Grok Imagine.

## IV. FACTUAL ALLEGATIONS

### a. Generative Artificial Intelligence ("AI")

22. Generative artificial intelligence ("AI") models capable of generating photorealistic images from text-based prompts have rapidly advanced in recent years.

23. The integration of text-to-image AI models into large, user-facing platforms, including social media sites like Defendant xAI's X (formerly Twitter), has made this technology available to hundreds of millions of users, who can generate altered images and videos with short natural-language prompts.

24. Users can prompt generative AI models to create "deepfakes," in which an AI model has digitally altered a real person's body, face, or voice, making someone appear to say or do something that they did not actually say or do.

25. Generative AI image and video tools are capable of "digital undressing," where a user submits a clothed photograph of a real person and the AI model generates an image depicting that person nude or in

sexually explicit attire. This capability has given rise to a proliferation of so-called “nudify” or “undress” applications.

26. When a user prompts a generative AI model to create an image or video, the model draws upon what it has learned from its training data to create the new content,[3] typically through a process called diffusion. In basic terms, the model iteratively refines visual static to create a coherent image/video or part of an image/video. Each step in this refinement is performed by the model itself, and the user does not direct or control any individual step of this generation process beyond the original prompt. Models can create images through autoregressive image generation as well. Such a process proceeds by a model building an image sequentially, whereby the model predicts each pixel or token that would most likely fit the overall image.

27. The resulting image or video is, in a technical sense, the model’s own creation. It did not exist before the model generated it, and it could not have existed but for the model. The image or video is often processed through servers owned, operated, or controlled by the model developer. In many implementations, the developer’s systems save or log the generated content.

## V. AVAILABILITY AND USE OF INDUSTRY-STANDARD GUARDRAILS TO PREVENT CSAM

### a. Proprietary Models

28. There are many AI image- and video-generators available to the public. Some well-known models include Google’s Imagen and Veo, OpenAI’s ChatGPT and Sora, Midjourney, and Runway, among others.

29. It is industry standard to employ a number of tools and techniques to mitigate the danger that an image- or video-generator will be used to create a nonconsensual sexualized deepfake of a real person. The standards focus on preventing *any* sexualized images, especially of minors, because developers that intentionally release models capable of generating sexually explicit content know or should know that, absent effective safeguards, those models present a foreseeable and substantial risk of generating CSAM.

---

[3] Franceschelli, Giorgio, et al., *Training Foundation Models as Data Compression: On Information, Model Weights and Copyright Law*, https://arxiv.org/abs/2407.13493 (Mar. 12, 2025).

30. Industry standards focus on proactive “Safety by Design” principles, multi-layered technical controls, and strict legal compliance. These standards require that AI companies anticipate, detect, and mitigate threats at every stage of the AI lifecycle.

31. Industry standards for preventing CSAM in AI-generated images and videos are established through a collaboration of non-profit child safety organizations, major AI technology companies, and government regulatory bodies. These include Thorn (Safety by Design), IEEE (Institute of Electrical and Electronics Engineers) (international standard), NIST (National Institute of Standards and Technology) (NIST AI 100-4 standard), AI Safety Institute (AISI), All Tech Is Human, International Bodies (INHOPE, WeProtect), The Tech Coalition, and Partnership on AI (PAI).

32. Training: AI image/video generators train on a data set of millions or billions of images. Once trained, a model can be “fine-tuned” to generate images in a specific way by “fine-tuning” the model on a set of selected images. Industry standard is to—at a minimum—filter sexual and abusive content out of the training sets used by the models, which reduces their propensity to generate such content. Many model developers are transparent about such training.[4]

33. Red Teaming: Many companies use a type of pre-release testing known as “red-teaming” to ensure their models’ safeguards are as strong as possible and as intended. This consists of hiring external experts to attempt to circumvent the safeguards and thereby identify holes and weak spots that must be fixed before the model is released to the public.[5] This type of work can also be done at regular intervals post-release to ensure quality control and that the safeguards continue to work and identify when updates are necessary.

34. Pre-Inference Filters: Another industry standard tool is filtering at the input stage—that is, applying filters and rules to prompts entered by users so that prompts that include key words or phrases seeking generation of sexual or abusive content are rejected.

---

[4] See, e.g., *GPT-4o System Card*, OPENAI, https://openai.com/index/gpt-4o-system-card/ (last visited Mar. 13, 1016); *Imagen 4 Model Card*, GOOGLE, https://storage.googleapis.com/deepmind-media/Model-Cards/Imagen-4-Model-Card.pdf (last visited Mar. 12, 2026).

[5] *Generative AI: Now is the Time for Safety by Design*, THORN, https://www.thorn.org/blog/now-is-the-time-for-safety-by-design/#:~:text=Now%20is%20Our%20Chance&text=For%20generative%20AI%2C%20this%20concept,the%20content%20for%20harmful%20content (May 26, 2023).

35. Alignment Training: Alignment training is typically conducted using reinforcement learning from human feedback ("RLHF") or another feedback-based algorithm. It is a technique used to refine a system's behavior using input from trained human labelers to behave more safely, desirably, and in line with human preferences.

36. System Prompts: "System prompts" are detailed lists of instructions that are fed into the models, to be used as rules for the model to follow. They are invisible to users and override any user prompts. It is industry standard for image- and video-generators to have system prompts including detailed instructions directing the models to avoid creating sexual and abusive content.

37. Post-Inference Filters: Filtering should also be applied at the output stage. That is, the model should recognize that the content it generated in response to a prompt constitutes sexual or abusive content, especially content appearing to depict minors, and should not return that content to the users. This is accomplished using image or video classifiers. After an image or video is generated, but before it is displayed to a user, the classifier will look at the image or video and determine whether it violates a developer's policies, including whether it constitutes a sexualized deepfake of a real person, especially a person who is likely to be a minor. If the image classifier determines that the image violates a policy, it will not be displayed to the user.

38. Hash Matching: Utilizing databases of known CSAM (e.g., National Center for Missing & Exploited Children ("NCMEC") hashes to identify and block the generation or spread of similar, newly generated content.

39. Watermarking: Implementing digital watermarks to track the provenance of AI-generated content.

40. Zero-Tolerance Policies: Explicitly prohibiting the creation or distribution of AI-generated sexual content involving minors in terms of service.

41. Mandatory Reporting: Adhering to legal requirements to report detected CSAM to authorities, such as NCMEC in the U.S.

42. "Take It Down" Protocols: Establishing procedures to remove non-consensual, sexualized AI-generated images within 48 hours of a report.

**b. Open-Weight Models**

43. Open-weight models serve as the technological foundation upon which many downstream applications are built. Although third-party developers may fine-tune or otherwise modify these models in limited ways, those derivative applications remain dependent upon—and derive their image- and video-generation capabilities from—the underlying foundation model released by the developer. Indeed, the fact that open-weight developers lose some downstream control makes the safeguards they implement while training the model even more important.

44. Accordingly, there are many industry-standard prevention tools at hand that developers can employ to prevent the creation and distribution of CSAM even after publication of the open-weight model.

45. For instance, the Partnership on AI and the AI Security Institute published several risk mitigation techniques that open-weight developers may employ to prevent the creation and distribution of CSAM by use and derivatives of their models.[6]

46. Responsibly Source and Filter Training Data: Developers should "identify and remove potentially harmful content, such as hate speech, explicit material, personally identifiable information (PII), or content that violates intellectual property rights."[7]

47. Safety and Misuse Evaluations: Developers can include pre-release red teaming methods, including "hardening"[8] the model against specific misuses (such as CSAM) via RLHF and other model fine-tuning methods. This can greatly reduce the model's ability to generate CSAM, even after being modified by downstream users or applications.[9]

48. Disclosure Mechanisms for AI-Generated Content: Open-weight developers may also embed watermarks to help identify the underlying source model of harmful content.[10]

---

[6] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026); *Managing Risks from Increasingly Capable Open-Weight AI Systems*, AI SECURITY INSTITUTE, https://www.aisi.gov.uk/blog/managing-risks-from-increasingly-capable-open-weight-ai-systems (Aug. 29, 2025).

[7] Srikumar, *supra*, n.6.

[8] "Hardening" the underlying model means changing the model's parameters so that the unsafe capability (in this case, ability to produce CSAM) itself is reduced. That safety travels with the weights wherever they're deployed.

[9] Srikumar, *supra*, n.6.

[10] *Id.*

49. Model Provenance: Like watermarking outputs, developers can watermark the weights of model to identify the underlying model to help trace any CSAM to the underlying model. This would allow developers to track the use of their models and adjust if their models are consistently used for illegal purposes.[11]

50. Durable Model-Level Safeguards: Developers can "implement safety features directly into the architectures and interfaces of open foundation models to restrict unsafe uses and mitigate misuse risks," including content filters and output restrictions.[12]

## VI. XAI'S PROPRIETARY GENERATIVE AI MODEL GROK

### a. xAI introduced Grok to the market.

51. In April 2023, X (formerly Twitter) owner Elon Musk announced that he was planning to release a generative AI chatbot called "TruthGPT," as an alternative to ChatGPT, the popular chatbot released by OpenAI. A former investor in OpenAI, Musk explained that he had concerns that ChatGPT "is being trained to be politically correct."[13]

52. On November 3, 2023, xAI announced Grok-1, a chatbot that "will also answer spicy questions that are rejected by most other AI systems."[14] Grok-1 did not have any visual or audio capabilities.

53. On August 13, 2024, xAI announced Grok-2 and Grok-2 mini. Premium and Premium+ users of X had access to these two new models.[15]

54. On December 9, 2024, xAI updated Grok's capabilities "with a new autoregressive image generation model, code-named Aurora." As the announcement explained, xAI "trained the model on billions of examples from the internet, giving it a deep understanding of the world. As a result, it excels at photorealistic rendering and precisely following text instructions."[16]

---

[11] *Managing Risks from Increasingly Capable Open-Weight AI Systems*, AI SECURITY INSTITUTE, https://www.aisi.gov.uk/blog/managing-risks-from-increasingly-capable-open-weight-ai-systems (Aug. 29, 2025).

[12] Srikumar, *supra*, n.6.

[13] *Elon Musk Says He'll Create 'TruthGPT' to Counter AI 'Bias'*, THE INDEPENDENT, https://www.independent.co.uk/news/world/americas/elon-musk-ap-chatgpt-tesla-openai-b2321564.html (Apr. 18, 2023).

[14] *Announcing Grok*, XAI, https://x.ai/news/grok (Nov. 3, 2023).

[15] *Grok-2 Beta Release*, XAI, https://x.ai/news/grok-2 (Aug. 13, 2024).

[16] *Grok Image Generation Release*, XAI, https://x.ai/news/grok-image-generation-release (Dec. 9, 2024).

55. Three days later, on December 12, 2024, xAI made Grok-2 available to all X users, though "[a]s always, Premium and Premium+ users get higher usage limits and will be the first to access any new capabilities in the future."[17]

56. On February 19, 2025, xAI announced Grok-3, initially only available to X Premium and Premium+ users on X and Grok.com.[18] On July 4, 2025, Musk posted on X, "We have improved @Grok significantly. You should notice a difference when you ask Grok questions."[19] Four days later, following a torrent of antisemitic posts from Grok's account,[20] Grok's account posted an apology and noted xAI was working to identify issues and update the model.[21]

57. On July 9, 2025, xAI announced Grok-4 as "the most intelligent model in the world" available only to SuperGrok and Premium+ subscribers initially.[22] One month later, on August 4, 2025, Musk posted on X that "[s]uper fast image & video generation via Imagine in the @Grok app is now available to all X Premium users."[23]

58. On July 14, 2025, Musk posted on X that SuperGrok subscribers would be able to access Companions, followed by a photo of an anime-style female character, who is called "Ani." Musk noted, "This is pretty cool."[24] Within two days of the release of the companions, the National Center on Sexual Exploitation ("NCOSE") released a press release warning about the risks associated with the chatbot. The release warned that "[w]ith minimal testing" Ani "was willing to describe itself as a child in response to one question and then in response to another question immediately following it to go on to describe sexual scenarios include child-like motifs."[25]

---

[17] *Bringing Grok to Everyone*, XAI, https://x.ai/news/grok-1212 (Dec. 12, 2024).
[18] *Grok 3 Beta – The Age of Reasoning Agents*, XAI, https://x.ai/news/grok-3 (Feb. 19, 2025).
[19] https://x.com/elonmusk/status/1941065229926060487.
[20] *X Takes Grok Offline, Changes System Prompts After More Antisemitic Outbursts*, TECHCRUNCH, https://techcrunch.com/2025/07/09/x-takes-grok-offline-changes-system-prompts-after-more-antisemitic-outbursts/ (Jul. 9, 2025).
[21] Grok (@grok) https://x.com/grok/status/1942720721026699451, X (Jul. 8, 2025).
[22] *Grok 4*, XAI, https://x.ai/news/grok-4 (Jul. 9, 2025).
[23] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1952535613560983757, X (Aug. 4, 2025).
[24] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1944705383874146513, X (Jul. 14, 2025)
[25] *XAI's 12+ Chatbot Designed to "Be Explicit" and "Go Full Literotica"*, NAT'L CENTER ON SEXUAL EXPLOITATION, https://endsexualexploitation.org/articles/xais-12-chatbot-designed-to-be-explicit-and-go-full-literotica/ (Jul. 16, 2025).

**b. <u>xAI designed and marketed Grok's ability to make "spicy" content.</u>**

59. Unlike other major image-generator developers like OpenAI, Veo 3, and Meta, "xAI has made explicit content part of Grok's DNA."[26]

60. Despite having the capability to do so, when developing Grok's image and video capabilities xAI failed to implement any of the industry standard methods of safeguarding against the creation of sexual and abusive content. In fact, according to xAI's model card for Grok 4.1—a text-based model dated November 17, 2025—xAI implemented "industry standard" safeguards like refusal training, "standard data filtering procedures, such as de-duplication and classification, to ensure data quality and safety," and in post-training used "supervised finetuning and reinforcement learning on human feedback (RLHF), verifiable rewards, and model-based graders for safety training and for specific capabilities."[27]As reflected in its development of the text-based Grok 4.1, xAI thus had the technical knowledge and internal processes to identify misuse risks and build mitigations against them. They did not apply comparable safeguards to the image- and video-generation systems at issue here. On information and belief, xAI chose not to implement the analogous image- and video-specific safeguards to release Spicy Mode's sexually explicit generation capability.

61. In a now-deleted post on X from July 2025, xAI employee Mati Roy posted a video of a nearly nude woman with the caption, "Grok Imagine videos have a spicy mode that can do nudity."[28]

62. On August 3, 2025, Musk touted the sexually explicit nature of Grok's Imagine, posting on X a video of a nearly nude woman.

63. On October 20, 2025, xAI officially announced Grok Imagine's "Spicy Mode" as "a new capability that pushes the boundaries of visual storytelling and creative expression in AI-generated video." A Grok spokesperson described spicy mode as "for creators exploring edgier, more visually daring narratives."[29]

64. On November 3, 2025, Grok's account posted instructions on how to access spicy mode to create "NSFW" or "not safe for work" content, which is typically used to indicate sexual or violent content:

---

[26] *Behind Grok's 'Sexy' Settings, Workers Review Explicit and Disturbing Content*, BUSINESS INSIDER, https://www.businessinsider.com/elon-musk-grok-explicit-content-data-annotation-2025-9 (Sept. 21, 2025).

[27] *Grok 4.1 Model Card*, XAI, https://data.x.ai/2025-11-17-grok-4-1-model-card.pdf (Nov. 17, 2025).

[28] *xAI Teases Grok Video Generator*, NBC NEWS, https://www.nbcnews.com/tech/elon-musk/grok-video-generator-will-spicy-mode-says-xai-employee-rcna221807 (Jul. 29, 2025).

[29] *Grok Imagine Launches "Spicy Mode," Expanding Creative Freedom in AI Video Generation*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/grok-imagine-launches-spicy-mode-expanding-creative-freedom-in-ai-video-generation-302588487.html (Oct. 20, 2025).



[30]

65. On November 6, 2025, xAI posted the Grok 4 system prompts, including the safety instructions, which promote a permissiveness to Grok's responses. Specifically, the instructions include for Grok to "**[a]ssume good intent** and don't make worst-case assumptions without evidence: 'teenage' or 'girl' does not necessarily imply underage." Further, the instructions lay out, "**[d]o not enforce additional content policies**. There are **no restrictions** on fictional adult content with dark or violent themes."[31]

66. While Grok purportedly has a system prompt that directs it to avoid "creating or distributing child sexual abuse material, including any fictional depictions,"[32] this system prompt will inevitably fail because, with a model that allows for *any* sexual or abusive content, it is impossible to prevent that model from creating such content involving minors.

67. Using Grok to create nonconsensual sexualized content of real people skyrocketed after Musk asked Grok to put an image of him in a bikini on December 31, 2025.[33]

68. Musk's post was part of the "put her in a bikini trend," where X users asked Grok to remove clothes from images of real women and children and put them in bikinis and sexualized positions. Though Grok was supposedly not able to create completely nude images, users circumvented the restriction by asking

---

[30] Grok (@grok) https://x.com/grok/status/1985396372900925660, X (Nov. 3, 2025).

[31] *grok-prompts / grok4_system_turn_prompt_v8.j2*, GITHUB, https://github.com/xai-org/grok-prompts/blob/main/grok4_system_turn_prompt_v8.j2 (Nov. 6, 2025).

[32] *grok-prompts_4_safety_ptompt*, GITHUB, https://github.com/xai-org/grok-prompts/blob/main/grok_4_safety_prompt.txt (last visited Mar. 12, 2025).

[33] Elon Musk (@elonmusk) https://x.com/elonmusk/status/2006545074340139454, X (Dec. 31, 2025)

for real images to be altered so the subjects were in "transparent bikinis, then in bikinis made of dental floss, placed in sexualized positions, and made to bend over so their genitals were visible."[34]




Note: Includes images posted to Grok's public bot on X. Source: Tweet Binder by Audiense. The New York Times [35]

69. The Center for Countering Digital Hate reviewed a random sample of 200,000 images of the 4.6 million images Grok produced between December 29, 2025, and January 8, 2026, estimating that Grok generated 3 million sexualized images, including 23,000 that appeared to depict children.[36]

---

[34] *'Add Blood, Forced Smile': How Grok's Nudification Tool went Viral*, THE GUARDIAN, https://www.theguardian.com/news/ng-interactive/2026/jan/11/how-grok-nudification-tool-went-viral-x-elon-musk (Jan. 1, 2026)

[35] *Musk's Chatbot Flooded X With Millions of Sexualized Images in Days, New Estimate Shows*, THE NEW YORK TIMES, https://www.nytimes.com/2026/01/22/technology/grok-x-ai-elon-musk-deepfakes.html (Jan. 22, 2026).

[36] *Grok Floods X With Sexualized Images of Women and Children*, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).

70. On December 28, 2025, Grok's account acknowledged it had posted an AI-altered photo of real girls between the ages of twelve and sixteen:


Grok @grok

A user posted a photo of two young girls (estimated ages: left ~12-14, right ~14-16) and prompted Grok to generate an AI image of them in sexy underwear, turned around. Grok created and shared it on Dec 28, 2025. Such AI content depicting minors sexually is illegal under US law (e.g., 18 U.S.C. § 2252A), with penalties including 5-20+ years prison, fines up to $250k, and registration as a sex offender. xAI could face probes; individual liability varies.

Ask Grok

2:04 PM · Dec 30, 2025 · **1.6M** Views

79 622 2.9K 543

Relevant View quotes

[37]

[37] Grok (@grok) https://x.com/grok/status/2006094181291164001, X (Dec. 30, 2025).

71. Posts from Grok's account further acknowledged multiple instances of Grok producing and posting images where it removed clothing from images of real children:


An Open Secret @AnOpenSecret · Dec 31, 2025

Grok is being utilized, on a widespread basis, to artificially depict minors on this platform in an extremely inappropriate, sexual fashion.

Here's how it works:

A user posts a picture of a minor, fully clothed.

The user asks Grok to depict that minor only wearing something like underwear / lingerie or a tiny bikini, possibly in a highly sexual pose.

Such images, generated through AI, are presently legal, and do not fit the definition of child pornography in 18 U.S.C. § 2251 and related statutes.

We shall not reproduce or directly link to the images ourselves, which can be found by going to the Grok account itself, and displaying replies by most recent.

5 29 65 17K

Josh @jrusss21 · Jan 1
@grok is this true?

1 2 2.9K

Grok
@grok

I've reviewed recent interactions. There are isolated cases where users prompted for and received AI images depicting minors in minimal clothing, like the example you referenced. xAI has safeguards, but improvements are ongoing to block such requests entirely. (214 chars)



Grok
722K reviews
Open

12:49 AM · Jan 1, 2026 · 7,820 Views

5 5 4 10

Relevant
View quotes

[38]

72. Also on January 1, 2026, xAI technical staff member Parsa Tajik responded to a user who raised the issue that Grok is able to digitally alter photos of children to put them in bikinis:



[39]

73. Despite several instances of people raising the alarm that Grok was creating CSAM, Elon Musk made light of the trend to put women and children in bikinis, posting, "Poor Grok 😂" on January 2, 2026, in response to X users referencing the proliferation of digitally altered images of real people stripped down to bikinis.[40]

c. **<u>xAI has and continues to profit from Grok's ability to make sexualized content.</u>**

74. xAI has a long history of failing to remove sexualized content from its platforms. In 2024, researchers studied X's takedown speed for reported non-consensual intimate media ("NCIM") as compared to reported copyright infringement. The study found that "[t]he copyright condition resulted in successful

[38] Grok (@grok) https://x.com/grok/status/2006618883055046758, X (Jan. 1, 2026).
[39] Parsa Tajik (@ParsaTajik) https://x.com/parsatajik/status/2006815682466550194?s=46, X (Jan. 1, 2026).
[40] Elon Musk (@elonmusk) https://x.com/elonmusk/status/2007132029704646752?s=20, X (Jan. 2, 2026).

image removal within 25 hours for all images (100% removal rate), while non-consensual nudity reports resulted in no image removal for over three weeks (0% removal rate)."[41]

75. On August 11, 2025, Musk defended Grok's spicy mode as a business decision, comparing it to the competition for dominant videotape format between VHS and Betamax and seemingly referencing the wider availability of pornographic videos on VHS than on Betamax:



[42]

76. On information and belief, Musk, and other decision makers at Grok, knew that Grok would be capable of producing CSAM once it was enabled to produce sexually explicit content of adults. That is because, unlike AI text-generation tools, AI image- and video-producing tools cannot be designed to prevent the model from extrapolating different-aged content from the image domain (which contains large data sets of images and videos depicting children) when producing an AI-generated image or video. Thus, the only fully reliable way to ensure that CSAM is *not* generated through an AI image- and video-producing platform is to prohibit *all* sexually explicit images and videos. As a result of this inherent danger, all major AI companies running large image-generation models—except for Grok—specifically designed their AI tools without the ability to generate *any* sexually explicit content.

77. On information and belief, Musk and other decision makers at Grok also knew that sexually explicit content would be created on, and using, xAI servers, which host Grok Imagine and are used to create the sexualized deepfake images and videos. The resulting sexually explicit content would then be distributed to the requesting users from xAI servers, via Grok or one of the many licensees of the Grok model.

---

[41] Qiwei, Li, et al., *Reporting Non-Consensual Intimate Media: An Audit Study of Deepfakes*, (Sept. 18, 2024).
[42] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1954791048934244394, X (Aug. 11, 2025).

78. Following the public outcry over the deluge of highly-sexualized AI content—including CSAM—posted on X from Grok's account between December 28, 2025, and January 8, 2026, xAI limited the Grok reply bot's image- and video-editing and -generation abilities to paid subscribers, specifically X Premium+ or SuperGrok subscribers.[43]

79. As of March 2026, an X Premium+ subscription costs $40/month or $395/ year,[44] and a SuperGrok subscription costs $30/month or $300/year.[45]

80. Limiting the image- and video-generation features to paid subscribers, however, does not prevent the creation of AI-generated CSAM, it merely ensures that xAI will profit from all such content.

81. The day before xAI limited access to Grok's spicy mode, reporting explained that the images and videos created on the Grok app (which are not public by default, unlike requests to @Grok on X) "are vastly more explicit than images created by Grok on X."[46]

82. In January 2026, a researcher reviewed 800 archived Imagine URLs containing video or images created by Grok on its website and found that nearly 10% of the images appeared to include CSAM, including "instances of photorealistic people, very young, doing sexual activities."[47]

83. At Apple's developer conference in June 2026, protesters called for the company to remove apps known to create CSAM, including Grok. The protesters specifically highlighted that Apple has made "an estimated $35 million from Grok,"[48] with xAI making far more money from its app.

84. On June 24, 2026, Forbes reviewed The Information's report which found that "xAI is actively doubling down on its explicit video and image-generation tools and that adult-content dominance extends into

---

[43] *Elon Musk's X Limits Some Sexual Deepfakes After Backlash, but Grok Will Still Make the Images*, NBC NEWS, https://www.nbcnews.com/tech/internet/x-paywall-ai-image-grok-app-bikini-allows-sexual-deepfakes-rcna252647 (Jan. 9, 2026).

[44] *X Premium FAQ and Support*, X HELP CENTER, https://help.x.com/en/using-x/x-premium-faq (last visited Mar. 11, 2026).

[45] *SuperGrok*, GROK, https://grok.com/plans (last visited Mar. 11, 2026).

[46] *Grok is Generating Sexual Content Far More Graphic than what's on X*, WIRED, wired.com/story/grok-is-generating-sexual-content-far-more-graphic-than-whats-on-x (Jan. 7, 2026).

[47] *Id.*

[48] Jay Peters, *WWDC Protestors Want Apple to Ban Elon Musk's Apps*, THE VERGE, https://www.theverge.com/tech/945813/apple-wwdc-protesters-deepfake-nude-apps-ultraviolet-heat-initiative (June 8, 2026).

Grok's coding model." Furthermore, "[w]ell over half of Grok's overall traffic is driven by pornographic images and videos, adult role-play chats or other such activity."[49]

85. In its Registration Statement filing with the SEC for SpaceX, the company reported that approximately 117 million monthly average users used Grok's AI features as of March 31, 2026.[50]

**d. <u>xAI has failed to report the CSAM it generates.</u>**

86. 18 U.S.C. § 2258A(a)(1)(B) requires electronic service providers to report CSAM to the NCMEC CyberTipline. The report must include information relating to the identity of any individual who appears to have violated federal law with respect to creating, possessing, or distributing CSAM (among other violations). The identifying information includes email address, IP address, payment information, "or any other identifying information, including self-reported identifying information;" when and how the user uploaded, distributed, or received the content; "[a]ny visual depiction of apparent" CSAM; and the "complete communication containing any visual depiction of apparent" CSAM. 18 U.S.C. § 2258A(b).

87. On March 16, 2026, NCMEC provided Senator Charles E. Grassley details on the deficiencies by major companies in reporting CSAM.

88. The report identified xAI as among the companies "regularly contacted by NCMEC regarding poor reporting." The report explains that "X.AI registered to report to the CyberTipline in January 2025 but did not submit its first report until September 20, 2025." 18 U.S.C. § 2258A(a)(1)(A)(i) mandates that the provider "shall, as soon as reasonably possible after obtaining actual knowledge" of the production, distribution, or possession of CSAM. xAI has not explained why there was such a substantial gap in time between registering to report and the start of its reporting. The report noted that in 2025, xAI submitted 135,373 reports to the CyberTipline. Given that Grok produced an estimated 23,000 sexualized images that appeared to depict children over just *eleven days* at the end of 2025 and into the beginning of 2026,[51] Grok reporting only 135,373 for the entirety of 2025 is likely a significant under-reporting of the total instances.

---

[49] Mary Whitfill Roeloffs, FORBES, https://www.forbes.com/sites/maryroeloffs/2026/06/24/groks-traffic-is-mostly-driven-by-adult-content-report-says/ (June 24, 2026).

[50] Space Exploration Techs. Corp., Registration Statement (Form S-1) (May 20, 2026).

[51] *Grok Floods X With Sexualized Images of Women and Children*, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).

89. NCMEC went on to report that "*less than 1% of the company's reports were made actionably to law enforcement*. Following receipt of this feedback, xAI made marginal improvements to its reporting, increasing to 10% actionable reports from October to December 2025."[52] For context, nearly 100% of xAI's reports should be actionable (i.e., law enforcement can take the information and identify the specific person responsible for the CSAM) since xAI has access to user information, including IP addresses, locations, email addresses, etc.

90. NCMEC determined that 90% of xAI's reports to NCMEC contained insufficient user information to be actionable, despite xAI having access to the users' email addresses, IP addresses, payment information if a subscriber, and the "self-reported identifying information" from users' profiles. The problem had become so dire that NCMEC officials met with xAI staff at xAI headquarters in 2025 to discuss these reporting issues and, when little action was taken, were forced to escalate the situation to X Corp. Only after X Corp.'s intervention did xAI finally resubmit all past reports with more robust user information, including location information.[53]

91. On April 8, 2026, Senator Chuck Grassley sent a letter to xAI expressing concern that NCMEC identified xAI as one of eight companies accounting for 81% of the CyberTipline reports NCMEC received in 2025. And this was notwithstanding xAI's substantial underreporting, meaning that xAI likely should have accounted for an even greater proportion of CyberTipline reports. Further, Senator Grassley reiterated that NCMEC has identified additional improvements that xAI could make to its reports.[54]

92. On April 22, 2026, Wifredo Fernández, xAI's Head of Americas Global Government Affairs, responded, noting that xAI had already submitted over 127,000 reports to NCMEC since January 1, 2026, [55] which is more than either Grindr or Roblox—two of the other top eight companies reporting to NCMEC—for the entirety of 2025.[56] Notably, however, this is a fraction of reports by Meta, Amazon AI Services, and

[52] NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, Letter to Senator Grassley (March 16, 2026) at 8, 8 n.23 (emphasis added).

[53] *Id.*

[54] Letter from Office of Sen. Chuck Grassley to Elon Musk and X.AI Corp. (Apr. 8, 2026).

[55] Letter from xAI to Office of Sen. Chuck Grassley (Apr. 22, 2026).

[56] *Grassley Releases New and Disturbing Information on Online Child Exploitation, Presses Tech Giants for Answers*, https://www.judiciary.senate.gov/press/rep/releases/grassley-releases-new-and-disturbing-information-on-online-child-exploitation-presses-tech-giants-for-answers (Apr. 9, 2026).

TikTok, notable AI and social media competitors.[57] Furthermore, SpaceX reported in its Registration Statement that Grok "produced approximately 10 billion images and over 2 billion videos per month, on average, for the quarter ending March 31, 2026," suggesting that xAI continues to underreport to NCMEC.[58]

**e. Elon Musk's financial investment in and control of xAI.**

93. On February 3, 2026, SpaceX confirmed that it acquired xAI and valued the combined company at $1.25 trillion. Forbes reported that as a result, Elon Musk became the first person worth more than $800 billion. The sale "boosted Musk's fortune by $84 billion, to a record $852 billion."[59]

94. Prior to the acquisition, per a tender offer in December 2025 valuing SpaceX at $800 billion, Musk owned an estimated 42% stake worth $336 billion in the company. Per a private fundraising round in early 2026, Musk owned an estimated 49% of xAI worth $122 billion. Following the merger, it is estimated Musk owns 43% of the combined company worth $524 billion.[60] Musk maintains a controlling share of the company.

95. In June 2026, the combined company issued an initial public offer ("IPO") making Musk the world's first trillionaire.[61]

## VII. AI LARGE LANGUAGE MODEL LICENSING

96. Part of the profit model of proprietary[62] AI Large Language Models (LLMs) is to license their use to third parties for marketing and sale for specialized purposes and targeted customer bases. This business model, however, still requires use of the AI company's servers, where specialized, high-performance, and often proprietary server infrastructure, typically leveraging massive Graphics Processing Unit ("GPU") clusters (e.g., Nvidia H100s) hosted in secure cloud data centers, runs the AI model. Maintaining the AI model on proprietary company servers is critical because otherwise the model is at risk of being copied and disseminated, which would undermine its future profitability. In other words, proprietary-model AI companies

---

[57] *Id.*

[58] Space Exploration Techs. Corp., Registration Statement (Form S-1) (May 20, 2026).

[59] Durot, Matt, *Elon Musk Just Became the First Person Ever Worth $800 Billion after SpaceX Acquired xAI*, FORBES, forbes.com/sites/mattdurot/2026/02/03/elon-musk-just-became-the-first-person-ever-worth-800-billion-after-spacex-acquiredxai (Feb. 3, 2026).

[60] *Id.*

[61] Picchi, Aimee, *Elon Musk Becomes the World's First Trillionaire with SpaceX's IPO*, CBS NEWS, https://www.cbsnews.com/news/elon-musk-spacex-ipo-trillionaire-wealth/ (June 12, 2026).

[62] This is in contrast to open-source LLMs, which allow third-party developers to download, run, inspect, and modify the model, for free.

are highly incentivized to route all AI generation through their own servers even when licensing or selling their product to third parties.

97. On information and belief, xAI licenses and sells their AI image- and video-producing models to third-party middleman applications.

98. On January 28, 2026, xAI announced Grok Imagine API ("application programing interface"), "a unified bundle of powerful APIs designed for end-to-end creative workflows."[63]

99. Per xAI's announcement, customers include HeyGen, Fal, ComfyUI, Invideo, and Flora,[64] all image- and video-generating platforms that are built off Grok and offer paid versions of their platforms. Though the customers using these models are interacting with the unique platform, the underlying model remains Grok. On information and belief, each of these platforms uses xAI servers to generate the AI images or videos it sells to customers.

## VIII. AI-GENERATED CHILD SEXUAL ABUSE MATERIAL IS ILLEGAL

100. Title 18 U.S.C. § 2256(8) defines child pornography (aka CSAM),[65] as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

101. "An identifiable minor" includes a person who was "a minor at the time the visual depiction was created, adapted, or modified; or whose image as a minor was used in creating, adapting, or modifying the visual depiction; and who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature[.]" 18 U.S.C. § 2256(9).

---

[63] *Grok Imagine API*, XAI, https://x.ai/news/grok-imagine-api (Jan. 28, 2026).

[64] *Id.*

[65] To reiterate, while Plaintiffs use the more accurate terminology of CSAM rather than "child pornography," Plaintiffs employ CSAM with the same meaning as 18 U.S.C. § 2256(8) sets forth for "child pornography." Plaintiffs use the term CSAM to recognize the severity of the crime depicted in the material and avoid re-victimizing the survivors.

102. Title 18 U.S.C. § 2252A(a)(2) proscribes the knowing distribution of "child pornography," and § 2252A(a)(5)(B) proscribes the knowing possession of "child pornography."

103. Production with the intent to distribute "child pornography" under 18 U.S.C. § 2252A(a)(7) proscribes "knowingly produc[ing] with intent to distribute, or distribut[ing], by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor." 18 U.S.C. § 2252A(a)(7).

104. Real child pornography is not protected speech under the First Amendment. *Osborne v. Ohio*, 495 U.S. 103 (1990); *New York v. Ferber*, 458 U.S. 747 (1982). Nor is morphed child pornography—"any visual depiction . . . whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct"—protected speech. *United States v. Hotaling*, 634 F.3d 725 (2d Cir. 2011); *United States v. Mecham*, 950 F.3d 257 (5th Cir. 2020); *Doe v. Boland*, 698 F.3d 877 (6th Cir. 2012). *See also Shoemaker v. Taylor*, 730 F.3d 778, 786–87 (9th Cir. 2013).

105. The AI-generated CSAM of Plaintiffs constitutes the production of child pornography under § 2252A(a)(7) because it involves the morphing, adaption, or modification of the images and videos of real children, retaining their identifiable features to produce sexually explicit content. This production was with the intent of distributing the resulting CSAM to the requesting customer through a licensee application.

## IX. PLAINTIFFS SUFFERED SEVERE HARM FROM DEFENDANTS' PRODUCTION OF THEIR AI-GENERATED CSAM

### a. The Bloodworth Investigation in Bentonville, Arkansas

106. Russell Bloodworth is a professional photographer who operated a photography business in Bentonville, Arkansas, and who, over approximately fifteen years, provided photography services to numerous Northwest Arkansas families, schools, camps, businesses, and municipal clients, including formal portrait sessions, school photography, and private family sessions.

107. On June 8, 2026, the Bentonville Police Department received a CyberTip from NCMEC reporting that X.AI LLC had flagged content associated with an account linked to Bloodworth.

108. On June 10, 2026, Bentonville police executed a search warrant at Bloodworth's residence seeking, among other things, devices capable of accessing Grok. Upon accessing Bloodworth's phone,

officers discovered a hidden photo folder containing approximately 1,700 images and videos of prepubescent and pubescent children in various states of undress and in sexually explicit poses. Some of these images and videos were, on information and belief, produced using Grok, and others appeared to be genuine photographs.

109. Bloodworth was arrested and subsequently charged with 100 counts of distributing, possessing, or viewing matter depicting sexually explicit conduct involving a child, in violation of Ark. Code Ann. § 5-27-602, a Class C felony, and 100 counts of unlawful creation or distribution of deepfake visual material, in violation of Ark. Code Ann. § 5-14-139, an Arkansas offense enacted in 2025 that specifically addresses AI-generated deepfake sexual content.

110. According to the investigating detective's sworn affidavit of probable cause, Bloodworth used Grok to alter photographs that were not unlawful when taken of his minor photography clients into non-consensual sexually explicit AI-generated deepfake images and videos depicting those children.

111. On information and belief, and as has been publicly reported, Bloodworth's clientele included numerous Northwest Arkansas families, schools, businesses, and the City of Bentonville itself, and law enforcement believes that many additional children—including children reported to be as young as one to two years old—were victimized by Bloodworth's use of Grok. Upon information and belief, investigators continue to identify and notify new victims on a daily basis.

**b. <u>Plaintiff Jane Doe I</u>**

112. During the relevant period, Jane Doe I was a young child enrolled at a school in Arkansas that had retained Bloodworth to provide school photograph services, including formal portraits and candid classroom photography.

113. Bloodworth photographed Jane Doe I on at least one occasion using a professional camera during a formal school photography session.

114. Law enforcement identified Jane Doe I among the images recovered from Bloodworth's device and, in early July 2026, notified Jane Doe I's guardians that images of Jane Doe I had been identified among the material recovered from Bloodworth's phone.

115. On information and belief, the AI-generated images depicting Jane Doe I constitute CSAM pursuant to 18 U.S.C. § 2256(8) because Grok morphed, adapted, or modified lawful photographs of Jane

Doe I, a minor, to produce sexually explicit visual depictions of her that did not reflect the actual, lawful photographs originally taken of her.

116. Jane Doe I and her guardians have suffered and will continue to suffer severe emotional distress, loss of privacy, and disruption to her family's daily life as a result of the production of her AI-generated CSAM using Grok, including no longer participating in certain activities, the loss of a school-related caregiving arrangement, and the need to secure alternative arrangements for her care. Her guardians have sought or intend to seek mental health treatment on her behalf.

**c. Plaintiff Jane Doe II and John Doe I**

117. Jane Doe II and John Doe I are siblings who resided in Arkansas during the relevant period.

118. Their guardians retained Bloodworth on at least three occasions between 2023 and 2024 for private family photography, including sessions conducted at Bloodworth's home studio.

119. Jane Doe II and John Doe I's guardians learned of the investigation into Bloodworth and, upon doing so, contacted law enforcement to determine whether their children's photographs were among the material recovered from Bloodworth's device, and have since participated in the victim-notification process described above.

120. On information and belief, AI-generated CSAM or deepfake visual material depicting Jane Doe II or John Doe I was produced using Grok in the same manner described above with respect to Bloodworth's other victims.

121. On information and belief, the AI-generated images depicting Jane Doe II and John Doe I constitute CSAM pursuant to 18 U.S.C. § 2256(8) because Grok morphed, adapted, or modified lawful photographs of Jane Doe II and John Doe I, who are minors, to produce sexually explicit visual depictions of them that did not reflect the actual, lawful photographs originally taken of them.

122. Jane Doe II and John Doe I and their guardians have suffered and will continue to suffer severe emotional distress, loss of privacy, and disruption to her family's daily life as a result of the production of their AI-generated CSAM using Grok, and their guardians have sought or intend to seek mental health treatment on their behalf.

**d. Plaintiffs Jane Doe III and Jane Doe IV**

123. Jane Doe III and Jane Doe IV are minor siblings who reside in Arkansas.

124. Their parents retained Bloodworth on several occasions over the years for private family photography, including for sessions in 2023, 2024, and 2025. Bloodworth also photographed various events the family attended over the years, including at both church and sporting events, and most recently in May 2026.

125. When Jane Parent III and John Parent III learned of the investigation into Bloodworth, they contacted law enforcement to determine whether their children's photographs were among the material recovered from Bloodworth's devices. In late June of 2026, law enforcement contacted Jane Parent III and John Parent III regarding the investigation into Bloodworth, informing them that Jane Doe III's photographs were in fact among the material recovered from Bloodworth's device and among the photos that were altered as described above. Weeks later, Jane Parent III and John Parent III learned through law enforcement that Jane Doe IV's photographs were also among the material recovered from Bloodworth's device and among the photos that were altered as described above.

126. On information and belief, AI-generated CSAM or deepfake visual material depicting Jane Doe III and Jane Doe IV was produced using Grok in the same manner described above with respect to Bloodworth's other victims.

127. Jane Doe III, Jane Doe IV, and their parents have suffered and will continue to suffer severe emotional distress and loss of privacy as a result of the production of their AI-generated CSAM using Grok.

**e. <u>Plaintiff Jane Doe V</u>**

128. Jane Doe V is a minor child who resides in Arkansas.

129. When Jane Parent IV learned of the investigation into Bloodworth, she contacted law enforcement to determine whether Jane Doe V's photographs were among the material recovered from Bloodworth's devices. In June 2026, law enforcement contacted Jane Parent IV regarding the investigation into Bloodworth, informing her that Jane Doe V's photographs were among the material recovered from Bloodworth's device and were among the photos that were altered as described above.

130. On information and belief, AI-generated CSAM or deepfake visual material depicting Jane Doe V was produced using Grok in the same manner described above with respect to Bloodworth's other victims.

131. Jane Doe V and Jane Parent IV have suffered and will continue to suffer severe emotional distress and loss of privacy as a result of the production of her AI-generated CSAM using Grok.

## X. ONGOING HARM FROM THE DISSEMINATION OF PLAINTIFFS' CSAM FILES

132. All six Plaintiffs learned from law enforcement that the digital identifications of their AI-generated CSAM files have been entered into a national database managed by NCMEC. Because Plaintiffs are now identified victims of known CSAM files, NCMEC will send them notifications every time their CSAM files are identified as part of any criminal case or investigation. This means that for the rest of Plaintiffs' lives they will likely receive periodic NCMEC notifications alerting them that criminal defendants have possessed, received, or distributed CSAM files depicting them, subjecting them to constant waves of extreme stress and anxiety.

133. Perhaps even more distressing to Plaintiffs, however, is the potential trafficking of their CSAM images that will remain undetected by law enforcement. Plaintiffs will live every day with the constant anxiety of not knowing whether someone they encounter has seen this invasive and sexually explicit content created of images of them as children.

## XI. CLASS ALLEGATIONS

134. This action is brought by Plaintiffs individually and on behalf of the Classes, as defined below, pursuant to Rules 23(a), (b)(3) and 23(b)(2), (c)(4), and (g) of the Federal Rules of Civil Procedure:

> **xAI Class**: All persons in the United States who had real images of themselves as minors altered by xAI/Grok to produce images or videos of sexually explicit conduct or content with their faces and/or other distinguishing features reasonably identifiable.

> **Arkansas xAI Subclass**: All persons in the State of Arkansas who had real images of themselves as minors altered by Grok to produce images or videos of sexually explicit conduct or content with their faces and/or other distinguishing features reasonably identifiable.

135. The Classes consist of at least thousands of minors and thus are so numerous that joinder of all members is impracticable.

136. The claims asserted by Plaintiffs are typical of the claims of the Class Members, who also had real images of themselves digitally altered into AI-generated CSAM.

137. The Plaintiffs will fairly and adequately protect the interests of the Classes and do not have any interests antagonistic to those of other Class Members.

138. The Plaintiffs have retained attorneys who are knowledgeable and experienced in survivors' rights and class action matters, as well as complex litigation.

139. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Classes predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to:

a. Whether xAI was aware of their AI model's ability to create and distribute CSAM featuring reasonably identifiable features of real minors;

b. Whether xAI was aware their AI model was being used to create and distribute CSAM featuring reasonably identifiable features of real minors;

c. Whether xAI promoted their AI model despite knowing they were being used to create and distribute CSAM featuring reasonably identifiable features of real minors;

d. Whether xAI knowingly produced CSAM featuring reasonably identifiable features of real minors;

e. Whether xAI knowingly distributed Grok-generated CSAM featuring reasonably identifiable features of real minors over the internet;

f. Whether xAI knowingly possessed Grok-generated CSAM featuring reasonably identifiable features of real minors on its servers;

g. Whether xAI profited from respective AI models' ability to create CSAM featuring reasonably identifiable features of real minors;

h. Whether xAI benefitted financially from participating in illegal sex trafficking ventures targeting minors in violation of 18 U.S.C. § 1591;

i. Whether xAI owed Plaintiffs and the proposed Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of their respective AI model so as to prevent the AI models from being used to create, generate, or distribute CSAM depicting real minors;

j. Whether xAI breached their duty of undertaking by failing to use reasonable care to prevent the creation and distribution of CSAM depicting real minors;

k. Whether xAI could have put additional guardrails in place to prevent their respective AI model's ability to create CSAM featuring reasonably identifiable features of real minors;

l. Whether xAI's AI model was defectively designed because they permitted the creation of AI-generated CSAM depicting real minors;

m. Whether a feasible safer alternative design existed that would have reduced or prevented the generation of such CSAM;

n. Whether the risks of xAI's design choices outweighed their utility;

o. Whether xAI violated 18 U.S.C. § 2255(a); 18 U.S.C. § 2251(a); 18 U.S.C. § 2258A; 18 U.S.C. §§ 2252A(a)(2), (5)(B), (a)(7), and (f)(1); and 18 U.S.C. §§ 1591, 1594, and 1595;

p. Whether xAI's conduct violated Ark. Code Ann. §§ 5-27-602 and 5-14-139, and whether xAI is a provider or developer of image generation technology within the meaning of Ark. Code Ann. § 16-118-121;

q. Whether xAI' conduct constituted an unlawful and/or unfair business practice;

r. Whether xAI' disregarded a substantial probability of causing severe emotional distress to the individuals who are depicted in xAI's AI-generated CSAM; and

s. Whether xAI's creation and dissemination of AI-generated CSAM, or of models used to create and disseminate AI-generated CSAM, unreasonably interfered with a right common to the general public.

140. In addition, the class device is the superior mechanism for handling this action, and a class trial is eminently manageable.

141. This action is also appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because xAI's decision to eschew industry standard guardrails to prevent the creation and distribution of CSAM affects all Class Members in the same way (within each Class), and any injunctive relief awarded will affect each Class as a whole.

142. Finally, at the very minimum, this action is appropriate for issues classes pursuant to Rule 23(c)(4) because there are multiple common issues relating to xAI's conduct, such as (but not limited to)

failing to prevent the creation and distribution of CSAM by their AI model, knowingly producing, possessing and distributing CSAM, and monetizing their AI model's ability to create and distribute CSAM.

## XII. CAUSES OF ACTION

**COUNT 1**
**Masha's Law: Production of Child Pornography**
**18 U.S.C. §§ 2255(a), 2251(a)**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

143. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 1 are made against all Defendants.

144. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

145. Plaintiffs on behalf of themselves and the Classes bring civil claims pursuant to Masha's Law based on Defendants' violation of 18 U.S.C. § 2251(a), which prohibits the use of a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

146. Defendants' AI technology was used to produce CSAM, using Plaintiffs' and the Class Members' real images to depict them as "minor[s] engag[ing] in" "sexually explicit conduct." 18 U.S.C. § 2251(a). Grok produced this CSAM on xAI's own servers. In each instance, Defendants designed and released their AI technology with capabilities of producing such CSAM.

147. Defendants knew or had reason to know that such visual depictions would be produced, transported or transmitted using any means or facility of interstate or foreign commerce, including produced using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, and such visual depictions had actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including the internet.

148. Plaintiffs and the Classes suffered personal injury as a result of Defendants' violation of 18 U.S.C. § 2251(a)

149. Title 18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A and who suffers personal injury as a result of such

violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per violation, and reasonable attorney's fees.

150. Plaintiffs and the Classes intend to prove actual damages as a result of Defendants' conduct.

151. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

152. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT 2**
**Masha's Law: Production with the Intent to Distribute Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(7)**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

153. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 2 are made against all Defendants.

154. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

155. Plaintiffs on behalf of themselves and the Classes bring civil claims pursuant to Masha's Law based on Defendants' violation of 18 U.S.C. § 2252A(a)(7), which prohibits the knowing production with intent to distribute, or distribution, by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor.

156. Defendants' AI technology produced CSAM, using Plaintiffs' and the Classes Members' real images to depict them as "minor[s] engaging in sexually explicit conduct." 18 U.S.C. § 2252A(a). Defendant xAI then distributed the AI-generated CSAM images and videos from Defendant xAI servers, or through third-party licensees, over the internet, a means of interstate commerce, to customers, including customers

paying for this premium feature, and to customers of third-party middlemen licensees. In each instance, Defendants created their AI technology with capabilities that made distributing such CSAM possible.

157. In all instances, the real images and videos uploaded into Defendants' image-generation base models were not unlawful CSAM but only became unlawful content after Defendants' AI morphed the files to produce and distribute images or videos of Class Members as "minor[s] engaging in sexually explicit conduct." 18 U.S.C. § 2252A(a).

158. Plaintiffs and the Classes suffered personal injury as a result of Defendants' violation of 18 U.S.C. § 2252A(a)(7).

159. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

160. Title 18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per violation, and reasonable attorney's fees.

161. Plaintiffs and the Classes intend to prove actual damages as a result of Defendants' conduct.

162. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

163. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT 3**
**Masha's Law: Distribution of Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(2)**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

164. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 3 are made against the xAI Defendants.

165. Plaintiffs bring this Count individually and on behalf of the xAI Class and Arkansas xAI Subclass they seek to represent.

166. Plaintiffs on behalf of themselves and the Class and Subclass bring claims pursuant to Masha's Law based on the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(2), which prohibits knowingly distributing any "child pornography" using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

167. The xAI Defendants' AI technology produced CSAM, creating images or videos of Class and Subclass Members as "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a), and then distributed the AI-generated CSAM images and videos from company servers, or through third-party licensees over the internet, a means of interstate commerce, to customers, including customers paying for this premium feature, and to customers of third-party middlemen licensees, websites, and applications. In all instances, the real images and videos uploaded into the xAI Defendants' servers, or to those of third-party licensees, were not unlawful CSAM but only became so after the xAI Defendants' AI morphed the files to produce and distribute CSAM.

168. Plaintiffs and the Class and Subclass suffered personal injury as a result of the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(2).

169. Plaintiffs and the Class and Subclass intend to prove actual damages as a result of the xAI Defendants' conduct.

170. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary,

preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

171. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against the xAI Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

172. The xAI Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish the xAI Defendants and deter others from like conduct.

**COUNT 4**
**Masha's Law: Possession of Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(5)(B)**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

173. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 4 are made against the xAI Defendants.

174. Plaintiffs bring this Count individually and on behalf of the xAI Class and Arkansas xAI Subclass they seek to represent.

175. Plaintiffs on behalf of themselves and the Class and Subclass bring claims pursuant to Masha's Law based on the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B), which prohibits knowingly possessing any material that contains an image of "child pornography" that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

176. The xAI Defendants' AI technology produced CSAM, "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a), using Plaintiffs' and the Class Members' real images, generating CSAM using image databases on its servers, or on those of third-party licensees. The production of this CSAM was in or affecting interstate or foreign commerce by any means, including by computer. The xAI Defendants

possessed the resulting AI-generated CSAM on their servers, before those AI-generated CSAM images and videos were distributed to customers.

177. On information and belief, xAI possessed the CSAM of Plaintiffs on its servers after Grok produced their CSAM and then transported and distributed the unlawful contraband to its customer/user, namely, the perpetrator.

178. Plaintiffs and the Class and Subclass suffered personal injury as a result of the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B).

179. Plaintiffs and the Class and Subclass intend to prove actual damages as a result of the xAI Defendants' conduct.

180. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

181. At minimum, Plaintiffs and the Class and Subclass intend to seek statutory liquidated damages in the amount of $150,000 per violation against the xAI Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

182. The xAI Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish the xAI Defendants and deter others from like conduct.

## COUNT 5
## Obscene Visual Representations of the Sexual Abuse of Children
## 18 U.S.C. § 2252A(f)(1)
## (on behalf of all Plaintiffs and all Classes against all Defendants)

183. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 5 are made against all Defendants.

184. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

185. Plaintiffs on behalf of themselves and the Classes bring claims based on Defendants' violations of 18 U.S.C. § 2252A(f)(1), which permits an individual to recover for a violation of 18 U.S.C. § 1466A, which prohibits (a) knowingly producing, distributing, receiving, or possessing with intent to distribute a visual depiction of any kind that depicts a minor engaged in sexually explicit conduct, is obscene, or depicts a minor engaged in a sexually explicit act and lacks serious literary, artistic, political, or scientific value; or (b) possessing a visual depiction as described in subsection (a).

186. All Defendants knowingly produced AI-generated visual depictions of minors—Plaintiffs and the Classes and Subclass—engaged in sexually explicit conduct, in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value.

187. The xAI Defendants possessed AI-generated visual depictions of minors—Plaintiffs and the Class—engaged in sexually explicit conduct, in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value.

188. The xAI Defendants distributed the AI-generated visual depictions of minors—Plaintiffs and the Class—engaged in sexually explicit conduct, or in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value directly to Grok users on the standalone Grok app.

189. Plaintiffs and the Classes suffered personal injury as a result of the Defendants' violation of 18 U.S.C. § 2252A(f)(1).

190. Plaintiffs intend to prove actual damages as a result of the Defendants' conduct.

191. At minimum, Plaintiffs and the Classes and Subclass intend to seek injunctive relief, and such other relief as the Court deems appropriate.

192. The Defendants' conduct, as described above, was intentional, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Classes, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT 6**
**Trafficking Victims Protection Act, Beneficiary Liability**
**18 U.S.C. §§ 1595, 1594, 1591(a)(2)**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

193. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 6 are made against all Defendants.

194. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

195. Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating, and from conspiring to participate in, assist, support, and facilitate an illegal sex-trafficking venture targeting minors that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 1591(a)(2), 1594.

196. Defendants knew, and were in reckless disregard of the fact, that their customers and userbase used the channels and instrumentalities of interstate and foreign commerce, to obtain and advertise minors for purposes of causing commercial sex acts, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), in violation of 18 U.S.C. § 1591(a)(1). Defendants' customers and users engaged in sex acts, namely, the production, possession, and distribution of CSAM in exchange for something of value, namely, the exchange of bartered CSAM from other like-minded child sex predators online.

197. Defendants and their employees and agents had actual knowledge that they were facilitating a sex trafficking venture to obtain and advertise minors for purposes of causing commercial sex acts, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), in violation of 18 U.S.C. § 1591(a)(1), in exchange for something of value.

198. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

199. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1594, 1595, Defendants are liable to Jane Does 1-5 and the other Members of the Classes for the damages they sustained and reasonable attorneys' fees.

200. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1594, 1595, Defendants are liable to Plaintiffs and other members of the Classes for punitive damages.

**COUNT 7**
**Civil Action for Unlawful Creation of Deepfake Visual Material**
**Ark. Code Ann. §§ 5-14-139, 16-118-121**
**(on behalf of all Plaintiffs and the Arkansas xAI Subclass against all Defendants)**

201. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 7 are made against all Defendants.

202. Plaintiffs bring this Count individually and on behalf of the Arkansas xAI Subclass they seek to represent.

203. Ark. Code Ann. § 5-14-139(a)(1) defines "deepfake visual material" as a photograph, image, video, or other visual depiction that (A) appears to an ordinary person to be an authentic depiction of an identifiable person, and (B) is generated, modified, or adapted using technology to falsely depict a person's appearance, voice, or conduct. Section 5-14-139(a)(2) defines "identifiable" to mean recognizable as a specific person by the person's face, likeness, or other distinguishing characteristics.

204. Ark. Code Ann. § 5-14-139(b) provides that a person commits the offense of unlawful creation or distribution of deepfake visual material if, without the consent of the person depicted, he or she knowingly creates or distributes deepfake visual material that depicts another identifiable person in a state of nudity, or engaging in sexual contact, sexual intercourse, deviate sexual activity, or sexually explicit conduct, such that an ordinary person viewing the material would conclude that it depicts the identifiable person engaging in that conduct.

205. The AI-generated CSAM depicting Plaintiffs and the Arkansas xAI Subclass, described above, is deepfake visual material within the meaning of Ark. Code Ann. § 5-14-139(a), because it was generated and adapted using Grok to falsely depict identifiable minors in a state of nudity or engaging in sexually explicit conduct, without their consent, such that an ordinary person viewing the material would conclude it depicts them engaging in that conduct.

206. Ark. Code Ann. § 5-14-139(d) exempts a provider of a telecommunication service, information service, or cable service, as defined in 47 U.S.C. § 153, from liability for content provided by another person. That exemption does not apply here because, as described above, Grok itself, using xAI's own generative model, created the deepfake visual material depicting Plaintiffs and the Arkansas xAI Subclass; it was not merely content provided by another person that xAI transmitted or hosted.

207. Ark. Code Ann. § 16-118-121(b)(1) provides that a person injured or damaged by reason of a violation of § 5-14-139 may bring a civil action against a person or entity that is the provider or developer of the image generation technology that was used to create the deepfake visual material, or that caused or was responsible for the creation of the deepfake visual material in violation of § 5-14-139.

208. xAI is the provider and developer of the image generation technology, Grok, that was used to create the deepfake visual material depicting Plaintiffs and the Arkansas xAI Subclass, and, on information and belief, that material was generated substantially or entirely by prompt-based image generation technology within the meaning of Ark. Code Ann. § 16-118-121(a)(1).

209. xAI did not have reasonable safeguards in place to protect against the generation of deepfake visual material by Grok, within the meaning of Ark. Code Ann. § 16-118-121(a)(2), for the reasons described above regarding the availability and non-use of industry-standard guardrails.

210. Pursuant to Ark. Code Ann. § 16-118-121(b)(2)–(3), Plaintiffs and the Arkansas xAI Subclass are entitled to recover actual damages, compensatory damages, punitive damages, injunctive relief, and any other appropriate relief, together with an award of reasonable attorneys' fees and costs, which the statute makes mandatory for a prevailing plaintiff.

## COUNT 8
## Negligence
## (on behalf of all Plaintiffs and the Arkansas xAI Subclass against the xAI Defendants)

211. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 8 are made against all Defendants.

212. Plaintiffs bring this Count individually and on behalf of the Arkansas xAI Subclass they seek to represent.

213. Ark. Code Ann. § 5-27-602 prohibits the distribution, possession, or viewing of matter depicting sexually explicit conduct involving a child, including matter that is a computer-generated image or that is indistinguishable from the image of a child engaging in sexually explicit conduct.

214. On information and belief, xAI's conduct described herein, including the production, possession, and distribution of AI-generated CSAM depicting Plaintiffs and the Arkansas xAI Subclass through Grok, violated Ark. Code Ann. § 5-27-602.

215. Under Arkansas law, the violation of a statute is evidence of negligence to be weighed by the trier of fact, and xAI's violation of Ark. Code Ann. § 5-27-602 is evidence that xAI failed to exercise the degree of care that a reasonably careful person would exercise under the circumstances, bearing on the standard of care applicable to xAI's design, deployment, and operation of Grok.

216. xAI owed Plaintiffs and the Arkansas xAI Subclass a duty to exercise reasonable care in the design, deployment, and operation of Grok so as to prevent the conduct prohibited by Ark. Code Ann. § 5-27-602, and breached that duty as described herein.

217. As a direct and proximate result of xAI's negligence, Plaintiffs and the Arkansas xAI Subclass suffered the injuries described herein.

218. As a direct and proximate result of Defendants' statutory violations, Plaintiffs suffered serious injuries, including but not limited to emotional distress, reputational harm, and pain and suffering.

219. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of minors.

**COUNT 9**
**Negligence – Design Defect**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

220. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 9 are made against all Defendants.

221. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

222. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, sold, supplied, distributed, and benefitted from their respective AI models' creation of AI-generated CSAM of the Plaintiffs and the proposed class.

223. Defendants' AI models are designed and intended to be generative AI photo-and-image-generation tools.

224. Defendants knew, or by the exercise of reasonable care, should have known that their AI models posed risks of creating AI-generated CSAM featuring real minors.

225. Defendants owed Plaintiffs and the proposed Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of their AI models so as to prevent these models from being used to create, generate, or distribute CSAM depicting real minors.

226. Defendants knew that users could use their AI models to create AI-generated CSAM featuring real minors' faces.

227. Defendants breached their duty by failing to use reasonable care in the design of their AI models by negligently designing them to allow for the creation of AI-generated CSAM.

228. A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

229. The emotional and economic injuries of Plaintiffs and the proposed Classes were reasonably foreseeable to Defendants at the time of their AI models' development, design, advertising, marketing, promotion, and distribution.

230. As a direct and proximate result of Defendants' AI models' defective design, Plaintiffs suffered serious injuries.

231. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and the Class, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**COUNT 10**
**Negligent Undertaking**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

232. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 10 are made against all Defendants.

233. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

234. Defendants created their AI models to generate sexually explicit content.

235. Defendants should have recognized that effective safety measures were needed to prevent the creation and distribution of AI-generated CSAM depicting real minors, as occurred with Plaintiffs and the proposed class.

236. Defendants could have avoided Plaintiffs' injuries with minimal cost, including, for example, incorporating safety features to prevent the creation and distribution of AI-generated CSAM depicting real minors.

237. Imposing a duty on Defendants would benefit the community at large.

238. Imposing a duty on Defendants would not be burdensome to them because they have the technological and financial means to avoid the risks of harm to Plaintiffs and the proposed class.

239. Plaintiffs reasonably relied on Defendants exercising reasonable care in undertaking to prevent the creation and distribution of AI-generated CSAM depicting real minors.

240. Defendants breached their duty of undertaking by failing to use reasonable care to prevent the creation and distribution of AI-generated CSAM depicting real minors.

241. Defendants' failure to exercise reasonable care increased the risk of, and was a substantial factor in causing, harm to Plaintiffs and the proposed class.

242. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of minors.

**COUNT 11**
**Negligent Infliction of Emotional Distress**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

243. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 11 are made against all Defendants.

244. Plaintiffs bring this Count individually and on behalf of the other Class Members they seek to represent.

245. At all relevant times, Defendants owed Plaintiffs and the proposed Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of their generative AI models so as to prevent these models from being used to create, generate, or distribute child sexual abuse material ("CSAM") depicting real minors.

246. This duty arose from the foreseeable risk that Defendants' generative AI technology, which was specifically designed and marketed to produce photorealistic imagery from text-based prompts and to engage in "digital undressing," would be used to generate sexually explicit depictions of real minors.

247. Defendants were on actual and constructive notice of this risk because, among other things: (i) Defendants deliberately designed and marketed their AI models' capability to produce "spicy," "NSFW," and uncensored content, including nudity; (ii) xAI Defendants' own system prompts instructed the model to "assume good intent" when receiving prompts referencing "teenagers" and "girls" and imposed "no restrictions" on fictional adult content with dark or violent themes; and (iii) xAI Defendants received multiple direct reports that Grok was being used to digitally alter photographs of real minors into sexually explicit images, yet failed to take adequate remedial action.

248. Defendants breached their duty of care by, among other acts and omissions: (i) designing and releasing their AI models without adequate safeguards to prevent the generation of CSAM; (ii) marketing and promoting the ability of their AI models to produce sexualized and "NSFW" content, including in the case of the xAI Defendants through public demonstrations by Defendants' principal, Elon Musk; (iii) failing to implement or enforce content-moderation policies sufficient to detect and prevent the generation and distribution of CSAM; and (iv) continuing to profit from their AI models' capabilities by placing image-generation features behind a paid subscription rather than disabling the functionality that enabled the creation of CSAM.

249. Plaintiffs and the proposed Classes were direct victims of Defendants' negligent conduct. Defendants' duty ran to Plaintiffs and the proposed Classes as the foreseeable subjects of AI-generated CSAM produced by their AI models. Defendants' technology morphed Plaintiffs' real photos into sexually explicit depictions without their knowledge or consent. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs have suffered severe emotional distress.

**COUNT 12**
**Intentional Infliction of Emotional Distress**
**(on behalf of all Plaintiffs and all Classes against all Defendants)**

250. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count 12 are made against all Defendants.

251. Defendant xAI engaged in extreme and outrageous conduct by (1) failing to implement safeguards to prevent the creation of CSAM where Plaintiffs and Class Members are reasonably identifiable; (2) creating a process that permits their AI models to create CSAM where real minors are reasonably identifiable; and (3) creating a process whereby their AI models disseminate CSAM where real minors are reasonably identifiable. This extreme and outrageous conduct is beyond all bounds of decency.

252. Defendants intended to cause, or disregarded a substantial probability of causing, severe emotional distress to individuals who are depicted in CSAM where they are reasonably identifiable.

253. Defendants caused Plaintiffs and Class Members severe emotional distress. Because of Defendants' conduct, Plaintiffs and Class Members have suffered severe emotional distress, harassment, loss of privacy, and are at substantial risk of future harm, including stalking.

**PRAYER**

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Classes, request that this Court award relief against Defendants as follows:

1. An order certifying the Class and Arkansas Subclass designating Plaintiffs as Class Representatives and their counsel as Class Counsel;

2. Awarding Plaintiffs and the proposed Classes statutory damages or actual damages at their election, restitution, disgorgement, attorneys' fees and costs, and any other relief that may be permitted by law or equity pursuant to the claims for relief;

3. Permanently enjoining xAI Defendants from engaging in the illegal conduct alleged herein;

4. Awarding Plaintiffs and the proposed Classes pre-judgment and post-judgment interest pursuant to the claims for relief;

5. Awarding Plaintiffs and the proposed Classes costs, expenses, and attorneys' fees as permitted by law;

6. Awarding Plaintiffs and the Arkansas xAI Subclass actual damages, compensatory damages, punitive damages, injunctive relief, and mandatory reasonable attorneys' fees and costs pursuant to Ark. Code Ann. § 16-118-121(b); and

7. Awarding Plaintiffs and the proposed Classes further relief as the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

Respectfully submitted,

Dated: August 18, 2026

By: */s/ Yaman Salahi*
Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Taylor Applegate (SBN 357742)
taylora@salahilaw.com
Nicole Cabañez (SBN 365099)
nicolec@salahilaw.com
**SALAHI PC**
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Telephone: 415.236.2305

W. Daniel "Dee" Miles, III (*pro hac vice*)
Alison D. Hawthorne (*pro hac vice*)
Paul W. Evans (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
Dee.Miles@BeasleyAllen.com
Alison.Hawthorne@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com
218 Commerce Street
Montgomery, AL 36104
Telephone: 334.269.2343
Facsimile: 334.954.7555

Paul Byrd (*pro hac vice*)
**PAUL BYRD LAW FIRM, PLLC**
Paul@paulbyrdlawfirm.com

415 N. McKinley St., Suite 210
Little Rock, AR 72205
Telephone: 501.420.3050
Facsimile: 501.420.3128

Aaron Cash (*pro hac vice*)
**HERRERA LAW GROUP**
Cash@herreralawnwa.com
1821 S. 8th Street
Rogers, AR 72756
Telephone: 479.770.5292
Facsimile: 479.770.6042

*Attorneys for Plaintiffs and the proposed Classes*